**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| CAROLINE ZINNER PARKER, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. H-09-2743 |
| | § | |
| PULTE HOMES OF TEXAS, L.P., | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND OPINION**

The plaintiff, Caroline Zinner Parker, resigned from her job at Pulte Homes of Texas, L.P. in December 2008. She alleges that she was constructively discharged and that Pulte discriminated and retaliated against her on the basis of her disability, anorexia nervosa. Pulte moved for summary judgment on the basis that the undisputed summary judgment evidence showed that Parker resigned after an extended leave of absence following her refusal to provide a physician's note stating that she was able to return to work, despite the fact that she had obtained such a note from a doctor. Pulte asserts that as a matter of law, there was no discrimination, retaliation, or constructive discharge. (Docket Entry No. 23). Parker responded, (Docket Entry No. 28), and Pulte replied, (Docket Entry No. 31).

Based on a careful consideration of the pleadings, the summary judgment evidence, and the record, this court grants Pulte's motion for summary judgment. Final judgment is entered by separate order. The reasons are set out below.

**I.      Background**

Parker began working for Pulte as a market research analyst in Houston in December 2003. (Docket Entry No. 23, Ex. 3 at 79, 85). She reported to Kimberly Paulus. (*Id.* at 86–87). In early 2005, Parker began having problems in her work performance and showed physical symptoms that included significant weight loss (over 80 pounds) and behavior changes. Parker took a 12-week leave of absence to obtain needed medical help. (*Id.* at 45). She was diagnosed as suffering from anorexia nervosa. (*Id.* at 38). She returned to work in January 2006, providing a note from her treating psychiatrist stating that she was medically able to work. (*Id.* at 102). Pulte required Parker to provide this note. When Parker returned, she was promoted to the position of marketing manager. (*Id.* at 105). After a change in supervisors, Paulus became Parker's supervisor again in 2007.

The issues leading to this suit began in 2007 and continued in 2008. In October 2007, Pulte missed four hours of a Pulte golf tournament when she was supposed to be working. She admits that she had to have the driver of her golf cart pull over so that she could vomit and then spent four hours in the bathroom. (*Id.* at 143–44).

Pulte asserts that in 2008, Parker exhibited performance problems. The record shows contemporaneous criticism by Paulus and others of Parker's performance. For example, in March 2008, a marketing budget for which Parker was responsible was exceeded by nearly $40,000. (*Id.* at 133–34). Parker does not dispute the problem but asserts that it was Paulus's and not Parker's responsibility. (Docket Entry No. 28 at 8). In April 2008, Parker failed to complete a "market repositioning" task involving a community known as "Water's Edge." (Docket Entry No. 23, Ex. 3 at 186). Parker admitted that the repositioning had not been completed but disputes that the problem was significant. (Docket Entrty No. 28 at 9). Parker missed meetings and another employee had to cover for her. (Docket Entry No. 23, Ex. 3 at 138). In May 2008, there was an

issue over an advertisement that was inconsistent with Pulte's usual guidelines.  Paulus reprimanded

Parker.  Parker's position in this suit is that Paulus was "unprofessional"; that someone else had

approved the ad; and that Paulus was blaming Parker for her "own managerial limitations."  (Docket

Entry No. 28 at 10).

It is undisputed that the day after the reprimand over the ad, Parker had an anxiety or panic

attack while driving on a work assignment.  Parker managed to pull over and avoid an accident, but

an ambulance had to be called.  Parker was given oxygen driven home.  (Docket Entry No. 23, Ex.

3 at 146–50).  A few days later, Parker had another panic or anxiety attack while driving to a work

location.  This attack was worse.  Parker again pulled over.  She laid on the ground by the roadside

until a passerby saw her and called an ambulance and coworkers.  An ambulance took Parker to the

hospital, where she was discharged with instructions to follow up with her doctor.  (*Id.* at 159–62).

Parker was consulting a doctor during this period.  (*Id.* at 40).  According to the medical

records, Parker was purging once or twice daily and binging.  (Docket Entry No. 23, Ex. 9).  She

was advised to see a primary care doctor, but did not.  (*Id.*, Ex. 3 at 170).  These facts were not

known to Pulte at the time.

Pulte did know of events that occurred at the work place.  In late May 2008, the Houston

Division president heard vomiting in Parker's office and saw her sitting on the ground with a trash

can in front of her.  (*Id.*, Ex. 10 at 62).  That same month, Parker vomited over a mattress in a hotel

room during a company meeting.  The mattress had to be replaced.  (*Id.*, Ex. 3 at 173–74; Ex. 10 at

73).  In early June 2008, during a work-related golf event, Parker and Paulus were in a golf cart

when Parker pulled over abruptly to vomit under a tree.  (*Id.* Ex. 3 at 177–78; Ex. 6 at 162).  A few

days later, she vomited in a trash can at a work event.  (*Id.*, Ex. 3 at 178–79; Ex. 6 at 176).  Parker

admits to daily episodes of vomiting, sometimes several times a day.  (*Id.*, Ex. 3 at 183).

In June 2008, Paulus and Parker met to discuss Paulus's concerns about Parker.  Parker

denied that she needed any help.  (*Id.* at 161).  Paulus then consulted with Pulte's Human Resources

Department and arranged a meeting with the Dallas-based Human Resources Director for the Gulf

Coast, Toya Rattler.  (*Id.*, Ex. 11 at 172–76).  On July 1, Paulus and Rattler met with Parker and

"offered her to either move forward with a short-term leave of sorts and/or a performance plan," but

stated that Parker would need a medical note clearing her to return to work.  (*Id.*, Ex. 6 at 180).

Parker asked for time to consider her options and sent an email asking for clarification.  (Docket

Entry No. 28, Ex. 13).  In response, Rattler sent the following email dated July 2:

> Caroline,
>     I apologize for the delayed response.  Per your request, I've
> recapped yesterday's conversation and the specific options.  Please
> call with questions.
>
> 1.     Your condition is affecting your job performance.  More
> importantly, we are concerned about your health.  We discussed
> several instances of performance issues.
> 2.     We think it is best for you to take time off to get the treatment
> you need.
> 3.     We recommend you take 30 days off to obtain treatment.  If
> you need more, we will consider it.  The leave will be treated as
> FMLA leave and you may be eligible for short-term disability.
> 4.     Before you return from leave, we need a return to work
> certification from a medical practitioner that states you are able to
> return to work without posing a direct threat to yourself.
> 5.     If you are not willing to take time off, we will discuss a
> detailed performance improvement plan.
> Please call with questions.  Otherwise, please contact me as soon as possible
> to share your decision.
>
> Thanks!  Toya

(*Id.*, Ex. 16).

On July 3, Rattler sent the following e-mail to Parker:

> Caroline:
> Per our discussion, we will need you to secure a return to work release from a doctor prior to returning to work. . . .
> 1).     Identify a medical doctor of your choice.  The purpose of the exam is to determine whether you are able to perform the essential functions of your job and whether working with your condition presents a direct threat to your health.
> . . .
> 3).     Notify us of your doctor's name, appointment date and time prior to the evaluation as we will be faxing the doctor a note capturing our concerns. You will be copied on this communication.
> Until you have secured a return to work release that accounts for the concerns we discussed during our meeting on Tuesday, you should not be working.  Similarly, please partner with your manager, Kimberly Paulus, to return your company issued computer immediately so that we may access work files and information needed in your absence.  Pulte reserves the right to require an independent medical evaluation after we have reviewed your doctor's note.
> Should you have additional questions or concerns, please contact me immediately to discuss. . . .

(Docket Entry No. 28, Ex. 17).

In an e-mail dated July 11, Parker responded by stating that she was in the process of obtaining the requested documentation.  She asked Rattler to let her know what "condition" Pulte was referring to and what concerns Pulte had so that Parker could find the best doctor to address them.  (*Id.*).  Rattler responded on July 15 (the e-mail was apparently written earlier but the transmission was unsuccessful).  The July 15 e-mail stated:

> Caroline,
>         I am writing in response to your July 11, 2008 e-mail message.  As we discussed on July 3, certain recurrent incidents have made us concerned regarding your ability to effectively and safely perform your duties as a Marketing Manager.  Among other things, you have experienced anxiety attacks while driving on company business that rendered you unable to move.  In one instance, a Construction Manager and Project Manager accompanied you to the Hospital to ensure your safety.  Employees have also reported

witnessing you experiencing "convulsion-like" movements, and vomiting in public areas of the office on multiple occasions. Finally, in May we received notice from Marriott Hotels in Austin that you had damaged hotel property by vomiting in the bed and failing to clean it or report it to the hotel staff.

We do not know whether you are disabled, or whether you have any particular medical diagnosis or condition. Rather, we are requesting that a physician examine you in order to address the above issues, and provide us with information on whether you are able to safely perform your job functions. Any information provided by the physician will be kept strictly confidential, and will only be shared with those who have a particular job-related need to know.

(Docket Entry No. 23, Ex. 14).

Parker responded on July 16. She wrote:

It is true that I had experienced 2 anxiety attacks in May. I have sought proper care for these attacks, have obtained medication and have not had any recurring attacks since the 2 attacks in May.

Although, it is true that I have vomited in the private restroom facility at the office, I have not at any time vomited in a "public area" at the office, never mind that you indicate that it has occurred more than once. This is a complete fabrication of the truth.

Lastly, as you know, back in May, I did vomit at the Marriott while we were away on a business trip. It was the result of having been out into the early hours of the morning with other Pulte employees — we were in Austin on company business and everyone including myself was drinking alcohol, but I was so drunk that I vomited. . . .

As you know I do suffer with Anorexia Nervosa. It is a disability, like any other disability. It does not prevent me from performing my job duties. It seems clear that you and Pulte Homes have singled me out because of my disability and are fabricating stories in an attempt to terminate my employment.

Nevertheless, I have done as you requested. I will be seeing Dr. Sheridan Diaz, MD . . . . As I have previously told you, I am ready, willing and able to perform my job duties. I am confident that Dr. Diaz will report the same.

(*Id.*).

Parker told Rattler that she had made an appointment with an internist, Dr. Sheridan Diaz, for July 17, 2008. (*Id.*, Ex. 3 at 201.). On July 17, 2008, Rattler sent a letter to Dr. Diaz, the physician Parker had identified as the one she chose for the medical evaluation. The letter included a description of the marketing manager's tasks. (*Id.*, Ex. 16). Parker asserts that this description differed from the one she had seen when she was promoted in that it included driving to the sales offices as a job duty.

Dr. Diaz examined Parker but did not review her prior medical records. (*Id.*, Ex. 15 at 76–78). He found a low heart rate and a low potassium level. But he also found that her weight was in normal range. Dr. Diaz gave Parker a note stating that she could perform her job duties. (*Id.*, Ex. 17 at 84; Ex. 18). But Parker did not give that note to Pulte, despite frequent requests from Pulte that she do so. (*Id.*, Ex. 3 at 214). Parker told Pulte that she had received medical clearance to return to work and that she was capable of doing so, (*Id.*, Ex. 19), but she did not give the doctor's note to Pulte.

On July 21, 2008, Pulte told Parker that she had been approved for FMLA leave from July 7 to September 26, 2008. This leave was unpaid but Pulte urged Parker to file a short-term disability claim. Pulte told Parker that she would be on regular pay when she returned to work and that she would have to submit a return to work notice from her doctor before she could return. (*Id.*, Ex. 20). On August 21, Rattler notified Parker that she had to contact the short-term disability insurer to file a disability claim in order to be eligible for paid leave. The letter stated that Parker's failure to do so meant that her absence from work was unpaid. The letter reminded Parker that Pulte would not allow her to return to work without a medical release from her doctor. (*Id.*, Ex. 21). Parker declined to apply for disability because she did not believe herself unable to perform her duties. (*Id.*, Ex. 19).

7

In response, on August 27, Pulte told Parker in an e-mail that she could return to work when Pulte received a note from her physician stating that she could "safely return to full duty." (*Id.*, Ex. 22). It is undisputed that Pulte told Parker, repeatedly, that the only condition to her returning to work was that she provide the medical note stating that she was able to do so. (*Id.*, Exs. 20, 22–24). Parker did not do so. She explained that she did not do so because she had decided that she "didn't want to return to Pulte to work." (*Id.*, Ex. 3 at 215).

On October 14, 2008, Parker sent a letter asking Pulte to change its records to show that she had been terminated. Parker wanted to obtain her 401(k) money, which she could not do without showing hardship unless she was shown as "terminated" rather than on "leave of absence." (*Id.*, Ex. 25). Rattler responded with an e-mail dated October 27 stating that Parker's employment had not been terminated; that she was on a temporary leave of absence; and that Pulte "both desires and expects" that Parker would return to work. The e-mail repeated the request that Parker provide a doctor's note. (*Id.*, Ex. 23). On November 3, Rattler sent a follow-up e-mail again asking Parker to provide the physician's note and pointing out that Parker had not explained why she refused to do so. (*Id.*, Ex. 24). Parker testified that she had concluded that Pulte's motives were "suspect," that she had been singled out because of her disability when she was required to submit a medical note, and felt that "Pulte wanted her out." (Docket Entry No. 28, Ex. 10 at 215). Parker resigned on December 5, 2008, without giving the medical note from Dr. Diaz to Pulte.

On July 31, 2009, Parker sued Pulte in Texas state court, alleging employment discrimination and retaliation in violation of the Texas Commission on Human Rights Act, Texas Labor Code § 21.051 and Texas common law. (Docket Entry No. 1, Plaintiff's Original Petition). On August 26, 2009, Pulte Texas LP removed the state court action to this court on the basis of diversity

8

jurisdiction.  (Docket Entry No. 1).   After discovery, Parker moved for summary judgment on the basis that the undisputed facts show that Parker's claims are without merit as a matter of law.  The arguments and responses are analyzed below.

## I.      The Applicable Legal Standards

### A.      Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf*, *Inc. v.  Nike*, *Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *See Celotex*, 477 U.S. at 325.  While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted).  "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir.  2009) (quotation omitted).  "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(a) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

## B.    ADA and TCHRA Discrimination

Although Parker did not assert a claim under the Americans with Disabilities Act, the TCHRA is intended to further the policies of that statute and the cases decided under that statute apply. *Haggar Apparel Co. v. Leal*, 154 S.W.3d 98 (Tex. 2004). Section 12112(a) of the ADA states:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a).

The elements of a *prima facie* showing of disability discrimination under the ADA are that the plaintiff is a "qualified individual" with a "disability" as defined by the ADA and that an adverse employment decision was taken because of the disability. *See Holtzclaw v. DSC Communications Corp.*, 255 F.3d 254, 258 (5th Cir. 2001); *Talk v. Delta Airlines, Inc.*, 165 F.3d 1021, 1024 (5th Cir. 1999). To establish a *prima facie* case under the ADA, a plaintiff must demonstrate: (1) that she

is a disabled person within the meaning of the ADA; (2) that she is qualified, that is, she is able to perform the essential functions of the job, with or without reasonable accommodation; and (3) that the employer took an adverse employment action under circumstances that give rise to an inference that it was based on her disability.  If the plaintiff makes a *prima facie* showing, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions.  *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 511 (5th Cir. 2003); *see Manning v. Chevron Chem. Co., LLC*, 332 F.3d 874, 881 (5th Cir. 2003); *Sherrod v. Am. Airlines, Inc*., 132 F.3d 1112, 1122 (5th Cir. 1998).  If the defendant satisfies this burden, the plaintiff has the burden of showing that the proffered reasons are pretextual.  *Gowesky*, 321 F.3d at 511.  If the claim reaches the pretext stage, the issue is whether the totality of the evidence, including the evidence raised at the *prima facie* case and pretext stages, raises a genuine issue of disputed fact material to determining whether the defendant took an adverse employment action against the plaintiff because of her disability.  *See Calbillo*, 288 F.3d at 725; *Anderson*, 477 U.S. at 255.  The question on summary judgment is whether there is a conflict in substantial evidence to create a jury question of disability discrimination.  *See Gowesky*, 321 F.3d at 512.  Pretext can be shown by "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'"  *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (quoting *Olson v. Gen. Elec. Astrospace*, 101 F.3d 947, 951–52 (3d Cir. 1996)).  However, "mere conjecture that [the] employer's reason is pretext . . . is an insufficient basis for the denial of summary judgment."  *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988).

A *prima facie* retaliation claim has three elements: "'(1) the employee must have engaged in an activity protected by Title VII; (2) the employer must have subjected the employee to an adverse employment action; and (3) a causal nexus must exist between the plaintiff's participation in the protected activity and the adverse employment action.'" *Scrivner v. Socorro Indep. Sch. Dist.*, 169 F.3d 969, 972 (5th Cir. 1999) (citing *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 705 (5th Cir. 1997)); *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 407–08 (5th Cir. 1999).

## III.   Analysis

Pulte does not appear to dispute that Parker has made a *prima facie* showing that she was disabled as a result of her anorexia nervosa.  The ADA defines "disability" as: (1) "a physical or mental impairment that substantially limits one or more major life activities"; (2) "a record of such an impairment"; or (3) "being regarded as having such an impairment."  42 U.S.C. § 12102(1). "Major life activities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  *Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 726 (5th Cir.1995) (quoting 29 C.F.R. § 1630.2(I)); *see also Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184, 201 (2002).  A plaintiff "must also show that the limitation on the major life activity is substantial."  *Hinojosa v. Jostens Inc.,* 128 F. App'x 364, 366 (5th Cir. 2005) (citations omitted).  "Disability" requires a plaintiff to be "prevented or even severely restricted from performing" the activities of "daily living."  *Id.* at 367.   For an impairment to be a "disability," the impact must be "permanent or long term." *Id.* at 1024; *see also Hinojosa*, 28 F. App'x at 368. "[T]he term 'disability' does not include temporary medical conditions, even if those conditions require extended leaves of absence from work."  *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 199 (4th Cir. 1997) (citation omitted), *abrogated on other grounds by Baird ex. rel. Baird v. Rose,* 192 F.3d

462 (4th Cir. 1999).  But an indefinite expected duration of an individual's disability does not

necessarily defeat an ADA action. *EEOC v. Chevron Phillips Chemical Co.*, 570 F.3d 606, 618 (5th

Cir. 2009).

Pulte disputes that Parker has shown that she was qualified to perform the essential

conditions of her job or that she was subjected to an adverse employment action that gives rise to

an inference that it was linked to her disability.  Alternatively, Pulte argues that it has shown

legitimate nondiscriminatory reasons for its actions and that, as a matter of law, there is no basis to

find a disputed fact issue on pretext.

A.      **The Claim Based on Pulte's Requirement that Parker Undergo a Medical Examination and Submit a Doctor's Certification that She Was Able to Work**

Parker argues that Pulte discriminated against her in requiring that she undergo a medical

examination in July 2008.  Parker asserts that the requirement for the examination was a "thinly

veiled attempt to discriminate against Caroline based on her disability" and a "pretext to

discriminate and ultimately terminate her from Pulte."  (Docket Entry No. 28 at 22.)

The ADA balances a proscription against using medical evaluations to pry unnecessarily into

the private lives of employees with the need to ensure a workplace safe for the employee at issue

and others.  Section 12112(d)(4)(A) of the ADA states:

> (d)     Medical examinations and inquiries:
> (4)      Examination and inquiry.
> (A) Prohibited examinations and inquiries. A covered entity
> shall not require a medical examination and shall not make inquiries
> of an employee as to whether such employee is an individual with a
> disability or as to the nature or severity of the disability, unless such
> examination or inquiry is shown to be job-related and consistent with
> business necessity.

A medical examination or inquiry must be "job-related" and "consistent with business necessity." "The case law on inquiries directed towards individual employees thus demonstrates that courts will readily find a business necessity if an employer can demonstrate that a medical examination or inquiry is necessary to determine . . . whether the employee can perform job-related duties when the employer can identify legitimate, non-discriminatory reasons to doubt the employee's capacity to perform his or her duties." *Conroy v. N.Y. Dep't of Correctional Servs.*, 333 F.3d 88, 98 (2d Cir. 2003). Many cases readily find business necessity and job-relatedness when the examination is clearly linked to a physical attribute or skill needed to perform a job, such as an employee who must take a weight-lifting exam for a pipefitting job. *See, e.g.*, *Fuzy v. S & B Eng'rs & Constructors, Ltd.*, 332 F.3d 301, 303 (5th Cir. 2003) (applying "business necessity" of §12112(d)(4) to weight-lifting test). Courts have also found these criteria met when the examination or inquiry are triggered by concerns over whether an employee's own mental or physical health threatens their ability to perform their job safely for themselves or others. *See, e.g.*, *Bodenstab v. Cnty. of Cook*, 539 F. Supp. 2d 1009, 1020 (N.D. Ill. 2008) (finding that it would be "grossly negligent" for an employer not to order a psychiatric examination under § 12112(d)(4) when an employee makes serious workplace threats); *Leach v. Mansfield*, Civ. A. No. H-07-4331, 2009 WL 3190463, at *4 (S.D. Tex. Sept. 28, 2009) (requiring psychiatric examination and doctor's note certifying ability to return to work of employee who complained of emotional reaction from work stress and sent increasingly aggressive e-mails to other employees); *Mickens v. Polk Cnty. Sch. Bd.*, 430 F. Supp. 2d 1265 (M.D. Fl. 2006) (erratic behavior in response to performance criticism was basis for requiring medical exam); *Kirkish v. Mesa Imports, Inc*., No. CV-08-1965-PHX-NVW, 2010 WL 364183, at *6 (D. Ariz. Feb. 1, 2010) (requiring medical examination justified when job

14

required driving and the employee disclosed a condition that required medications).

In this case, the summary judgment record is undisputed that when Parker returned to work in 2006, she was promoted to the position of marketing manager, which required her to travel to different locations as a routine part of her job.  She visited each of 11 or 12 locations multiple times and Pulte had to travel to other locations to coordinate golf tournaments and different events at hotels.  The job required that Parker drive herself to these locations.  (Docket Entry No. 23, Ex. 3 at 110–14).  The evidence is undisputed that in May 2008, on two occasions, Parker had what she described as panic attacks or anxiety attacks while driving, managed to pull over, and had to be rescued by an ambulance.  The first time, she was administered oxygen and released to be driven home; the second time, she went to the emergency room.  During this same period, late May and early June 2008, Parker was seen on three separate occasions vomiting at work or at a work-related event, once into a trash can in her office and twice in public at events.  She also vomited over a mattress at a hotel during a work related stay and had to pay to replace that mattress.  Parker does not dispute that during this period, she was "purging" on a regular basis.  Although Parker disputes the reason for the criticisms of her performance during this period, she does not dispute that there were criticisms  during this period.  Nor does she dispute that when Paulus met with Parker in mid-June 2008 to discuss these events and the concerns they raised, Parker denied that she needed any additional help or that additional action was needed.  (*Id.*, Ex. 6 at 161).  It was after these events that Paulus and Rattler met and told Parker that she could choose between the choice of a short term leave or continuing to work with a performance plan and that under either option, she would have to obtain a letter from a medical professional of her choosing stating that she could return to work.

Pulte has clearly demonstrated legitimate nondiscriminatory reasons for requiring Parker to submit to a medical examination and obtain a doctor's note certifying her ability to work. Parker has not identified a genuine issue as to pretext. The undisputed facts in the summary judgment record, combined with the prior history of anorexia that had required Parker to take a medical leave of absence in 2005, show that, as a matter of law, Pulte complied with the business necessity and job relatedness requirements when it told Parker that she could not return to work without medical clearance to do so.

Parker's effort to raise a fact issue by pointing out that no immediate action was taken when she had the driving incidents is unavailing. The record shows that after the second driving incident, Paulus did speak to Parker, who said that she had seen her doctor and had some medications changed to address her issues. (*Id.* at 174). The record shows that the combination of the driving incidents and the recurring vomiting at work and work related events and Parker's later denial of a need for additional steps to address these issues led to the decision to require a doctor's note. There is no basis for an inference of pretext. *Cf. Morgan*, 108 F.3d at 1323–24 (employer's monitoring of employee's attendance after it learned of her anorexia nervosa and depression supplies no negative inference, even though, except for the attendance problem, the employee's performance was acceptable).

Similarly, Parker's argument that the formal description of her job did not include driving as a requirement does not raise a fact issue as to pretext. Business necessity and job related are not measured solely by the formal job description but by what the job in fact requires. *See, e.g.*,*Walders v. Garrett*, 765 F.3d 303, 310 n.19 (E.D. Va. 1991).

The record shows that, as a matter of law, Pulte did not discriminate against Parker on the basis of her disability in requiring her to take a medical examination and submit a doctor's note certifying her ability to work.

### B.    The Claim of Adverse Employment Actions Based on a Disability

"An adverse employment action consists of 'ultimate employment decisions' such as hiring, granting leave, discharge, promoting, and compensating." *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 282 (5th Cir. 2004) (quoting *Felton v. Polles*, 315, F.3d 470, 486 (5th Cir. 2002)). "[I]t is beyond dispute that a termination constitutes and adverse action." *Id.*; *see also Mota v. Univ. of Tex. Houston Health Sci. Ctr.*, 261 F.3d 512, 519 (5th Cir.2001). "Under the ADA, 'discrimination need not be the sole reason for the adverse employment decision, [but] must actually play a role in the employer's decision making process and have a determinative influence on the outcome.'" *Pinkerton v. Spellings*, 529 F.3d 513, 519 (5th Cir. 2008) (quoting *Soledad v. U.S. Dep't of Treasury*, 304 F.3d 500, 503 (5th Cir. 2002)). "Unknowing, negligent, or benign handicap discrimination that produces a failure to make a reasonable accommodation" is insufficient. *Kelly v. Boeing Petroleum Servs., Inc.*, 61 F.3d 350, 366 (5th Cir. 1995).

Parker asserts that placing her on short-term leave while she obtained a doctor's clearance to return to work was an adverse employment action. Assuming it was, for the reasons set out above, the choice was justified by the legitimate nondiscriminatory reasons Pulte identified, and Parker has not presented or identified evidence that gives rise to a fact issue on pretext.

Parker also asserts that although she resigned, she was constructively discharged. To determine whether an employer's actions constitute a constructive discharge, courts must consider if "working conditions [became] so intolerable that a reasonable person in the employee's position

17

would have felt compelled to resign." *Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 480 (5th Cir. 2008).  The Fifth Circuit has identified six factors to aid in the constructive discharge inquiry: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (6) offers of early retirement that would make the employee worse off whether the offer were accepted or not.  *Id.* at 481.  Although constructive discharge claims generally involve employees' allegations that they effectively were forced to resign because of intolerable working conditions, an employee also may demonstrate constructive discharge if she resigns after the employer communicates that the employee will be fired.  *EEOC v. Univ. of Chicago Hosp.*, 276 F.3d 326, 332 (7th Cir. 2002); *Spulak v. K Mart Corp.*, 894 F.2d 1150, 1154 (10th Cir. 1990).

Parker emphasizes that during her leave of absence, she did not have e-mail access to her work account, she had to return her computer, and she was not paid.  But the record makes it clear that Parker could have returned to work at full pay any time after July 30, 2008, when she received a note from Dr. Diaz stating she could return to work.  Parker decided not to provide the note to Pulte, despite repeated requests that she do so.  Parker cannot turn her own refusal to comply with the only condition for her returning to work — a condition she could have met at any time after July 30 — into a discriminatory constructive discharge.  Pulte's motion for summary judgment on the discriminatory discharge claim is granted.

Parker also asserts a retaliation claim, but she has failed to identify any protected activity before she resigned.  Summary judgment is granted as to this claim.

## III.    Conclusion

18

Pulte's summary judgment motion is granted.  This case is dismissed, with prejudice, by an order of final judgment separately entered.

SIGNED on February 25, 2011, at Houston, Texas.

_____

Lee H. Rosenthal
United States District Judge

19